Case number 17-7051, Spanski Enterprises, Inc. versus Toluansia. Polsky, S.A. Appellant. Mr. Deutsch for the appellant. Mr. Zabin for the appellee. Ms. Romero for the amicus curiae. May it please the Court. My name is Andrew Deutsch. I am speaking on behalf of the appellant, and I would like to reserve five minutes before the vote. My client is the National Television Network of Poland. It is the creator of the content that is at issue in this copyright infringement case. It has uploaded that content, along with thousands of other programs that it has produced, to a Polish video-on-demand system which serves the 38 million citizens of Poland who pay for the operations of TVP through taxes and licenses. The question presented in this case, at its essence, is whether because someone in the United States, in this case the plaintiff's lawyers, was able to access that system and stream to themselves some of this program, has my client committed an infringement? Well, the lawyers in the United States could not have done that if your client had not eliminated the geo-blocking mechanism that was in place. It wouldn't have happened. It wouldn't have happened if it had never been geo-blocked. So that's not an accurate statement of the issue before us. No, I disagree, Your Honor. We take as a given, because it was found by the district court, that there was no geo-blocking. It doesn't matter for purposes of this case whether there was never any geo-blocking and my client breached a contract with the plaintiff, or my client removed it, or the plaintiff evaded geo-blocking. Their position is if they could see it in the United States, no matter how they could see it in the United States, my client committed an infringement in the United States. Let me see if we can get at the issue this way. Suppose this had all occurred in the United States. Suppose your client was not a Polish broadcaster but an American broadcaster. And all the other circumstances are the same. Do you have any doubt that this would have violated the copyright laws? I don't think the hypothetical could have occurred because both parties couldn't have owned copyright in the same material at the same time in the United States. I'm not trying to evade the question, but I'm trying to understand what the point is the court is seeking. All right. Well, go ahead. I want to go, there are many issues in this case, but I want to go directly to extraterritoriality because I think it's at the core. There's no question that everything my client did took place in Poland. They uploaded the programs there and they undertook the formatting that the district court found to be infringing. But the performance occurred in the United States. No, Your Honor, that's not correct. This is the error made by the government. By the government? By the government. I guess by me too, right? Yeah. Congress, when Congress... Congress, what Congress was concerned about with the copyright, it was the public performance, correct? No. What Congress was concerned about, and the Supreme Court said this very clearly in the area, that when it amended these particular provisions, it was to bring cable television systems within the definition of someone who performed. The area says that perhaps five times in the opinion, so we have a definitive description of what Congress's purpose was. And the way that Congress did this was by concluding... But the court, I mean, that isn't the way we read Supreme Court cases. Yes, you're totally right. The court was very sensitive in that case to the particular circumstances of Mario, but it interpreted the statute that's at issue here. It interpreted the word performance. It did indeed, Your Honor. Yeah, and that's the principle of the case that applies here. The principle of what the Supreme Court found in Aereo and what is apparent from the legislative history of these very provisions, you can see it at page 63 of the House Judiciary Report, is that there's not one unitary performance. There are a series of successive performances which Congress determined would occur between the singer who stands on a platform and sings a song and the viewer who turns on a TV or computer and sees that. Each of them are a separate performance. The error of the district court and... I'm sorry, Your Honor. No, go ahead. The error of the district court and the error of the plaintiffs and the government is in conflating these into one single performance. Okay, suppose in this case the geo-blocking was eliminated, but no one in the United States accessed it. No one. Is there still a performance? Yes. Where? In Poland. But no one's watching it. Your Honor, if you take a look at the legislative history, which is... Wait, wait. Don't answer my question, a fact question, by telling me about legislative history. Your theory is there's two performances, right? One in Poland and one in the United States, correct? Yes. Okay, so I said if no one in the United States is watching, where's the performance? Congress said, and this is, again, I'm trying to tell you because I'm not trying to make my own definition of performance or even use a common sense definition of performance. I'm using what Congress said when it enacted this. It said a broadcasting network is performing when it transmits his or her performance and any individual is performing whenever he or she communicates the performance by turning on a receiving center. That's at page 63 of the House. Well, doesn't that say there's a performance in the United States? That says that when the SEI lawyers turned on their computer, they were conducting a performance in the United States. But it doesn't say that my client was performing in the United States because a broadcasting network is performing when it transmits a performance. The transmission takes place under the definition of transmit as well when a signal is sent, not when it is received. And that is the way it is. Didn't Aereo reject that very argument? No, not at all. Aereo relied on that argument in dealing with the first. Aereo made two, the defendant in Aereo made two arguments, one that it didn't perform and two that it didn't perform publicly. These issues arose on the first leg of that. Was it performing when its users received signals that had been taken out of the air and relayed through Aereo's intended? The Supreme Court, yes, it did, said yes, it did, because it's just like the cable systems that Congress was going after in 1976. But what the Court did say was that Aereo performs if all it does is enhance the ability of its viewers to receive a signal. Where does that performance take place? It doesn't take place in the living rooms of the people who watch it. It takes place at the headquarters of Aereo. Where did the performance of TVP take place? It made it possible to see these signals and hear these signals at its headquarters in Warsaw, not in the offices of Loeb and Loeb. So you say in your brief, I'm looking at page 38, you say, quote, this is consistent with what you're saying here, acts committed abroad cannot form the basis for a U.S. copyright infringement suit, period. And then you cite two cases. Suba Films in 9th Circuit, which, and you think that supports that view? I do. Would I be wrong if I said that it said that that was involving distributing copyrighted films abroad? You would not be wrong. That's correct. Okay. So that's not this case? It is the principle, but it is not this case. But it's not this case. It's a different right. Nor is the other case you cite, lure music. That's the same thing. It's also not a public performance. That's distributing copyrighted materials abroad. So can you cite any case? Maybe there is one. I don't mean to be suspicious. But can you cite any case at all that says that imposing liability in a situation like this, where your client acts abroad but intends to cause a performance, unlawful performance in the United States, is an extraterritorial application of the law, not a domestic one? Do you have one case? I disagree with the intent issue. No, Your Honor. The government itself says this is a question of first impression, and we agree that to that extent it is. Okay. But we think we're supported by the language of the history and how a performance is defined. We're supported by the legislative history that the Supreme Court relied on in Aereo, where it said there's not one performance in this instances. There are multiple performances. We believe we are supported by the fact that there is not a hint in this legislative history that the government intended to say a performance only occurs where the public is located. There's nothing whatsoever. There's no case cited by the government to support that. And we know what the Congress's purposes in enacting these amendments were because Aereo tells us that. Let me ask you about two hypotheticals that the government raises in its brief. They say if you're right, U.S. copyright holders wouldn't have any protection against pirates who steal copyrighted materials and broadcast to the United States from abroad, right? No, that's not true. That's not true? That's not true. If these infringing acts are committed abroad, a pirate is a criminal in the country where they are acting, and the government and the plaintiffs in the amici in this case have all prosecuted or worked with foreign governments to prosecute pirates who are abroad. What about their next example? A San Diego TV station could avoid licensing fees simply by moving to Tijuana. I think that there's probably, although it's not, of course, our case, I think there's probably some difference between a network that sits and broadcasts radio waves over the air into the United States border, but that's not our case. The question here is whether a company sitting in Poland doing nothing more than setting up a video-on-demand system in Poland for polls. But you keep saying, yes, more, and that's not the record in this case. The record in this case is not that TVP did, quote, nothing more. The record in this case, I know you challenge these, but, you know, we review these fact findings for clear air. So the record in this case is that TVP intentionally eliminated the geo-blocking provision. I understand that, Your Honor. But isn't that significant? It is not. It is at most, it would be the same if it never had geo-blocking. It's geo-blocking, the question comes down. Wait, explain that to me. It would be no different from the perspective of the argument being raised against my client if it had no geo-blocking or if it were. Why is that? Because the default position was that everything would be geo-blocked, right? So somebody at TVP had to actively eliminate the geo-blocking. The theory of infringement here is not that there was geo-blocking or that there wasn't. It's that it was able to be received in the United States. Because TVP eliminated the geo-blocking. But the clause doesn't matter, Your Honor. It doesn't matter in any respect because this, according to both parties on the other side, is a strict liability tort. It doesn't matter what you intend. And either this, the same principle has to apply whether there was no geo-blocking, geo-blocking was taken away, geo-blocking failed for a technical reason, or geo-blocking was evaded. In all instances, the performance says are exactly the same. And there's nothing in the Copyright Act to say that the results should be different. We say that no matter which of those permutations you have, the consequence is that the only performance that takes place is in Poland. If you alter the format in Poland, it doesn't make it a United States performance. And I would point out that this does create serious issues of international conflict. What my client did in Poland is not a violation of Polish law. And we are saying, however, what's done in Poland is a violation of U.S. law, and that Polish copyright owner can be prosecuted in the United States. That is the area in which we have to find a clear indication that Congress intended to reach this conduct. And the plaintiffs and the government have indicated no evidence in the statutory language. So to be sure I totally understand your position. Yes, Your Honor. Could you just once again state as clear as you can why, setting aside the extraterritorial issue, which is a separate issue, why the case isn't controlled by Aereo? It's not, quote, controlled by Aereo, did you say? Yeah. It's not controlled. I mean, I don't believe Aereo in that sense is relevant. Set aside the extraterritorial. Okay. The question is, is it a performance? Yeah, exactly. That's the next question. Yes. We don't think so because my client was a passive actor, and the active actors here were the plaintiffs' own attorneys. But the district court's findings are to the contrary. This is not a fact find. We are not disagreeing with those fact findings on this issue. There's no question that the district court found that the plaintiffs' own attorneys, suspecting that my client had reached its contractual obligation to GEOOC, reached out to this system, initiated the transfer, received the transmissions, and reported. Okay. But what did the district court find about what TVP did with respect to the content? The district court found that my client. That's critical under Aereo, right? I don't think so. Then that's what I was referring to before. The argument you're making here is the very argument that was made in Aereo, that there's no performance by TVP because the real performance took place in the United States when they flipped on and tried to access the DOD. But Aereo says that there's performance on both sides, right? Aereo said that in that specific case, under the facts of some of an entity that was essentially a cable TV network, that it fell directly into Congress's intent, but it also reserved. What did the district court find were the actions of TVP here that constituted performance? The way the district court had it was that there was a performance that started in Poland. And what was done? In Poland, that this content was uploaded and a geoblock was removed. Right. That was the alleged infringement. To agree with that, you have to assume, which no case has ever held, that the United States copyright law requires geoblocking. And if you don't do that, you're infringing. The copyright infringing performance occurred in the United States. We disagree with that, Your Honor. That doesn't help. It isn't compelling. But that's where it, in fact, happened. No, Your Honor. No? A performance occurred in the United States, but it was the performance of the plaintiff's attorneys. You can't ignore the very clear legislative history in this case where Congress said that there are successive performances, not one, and that the broadcaster's performance occurs when it transmits. Then, obviously, it also occurs where it transmits. Again, I refer the court to page 63 of the House report, where Congress says exactly what it intended to do in amending this language. And if we, and since Congress is, you can't apply these principles extraterritorially unless there is a clear intention on Congress's part to do so, since everyone agrees the Copyright Act doesn't apply extraterritorially. And since Congress said there is not one performance, there are multiple. Okay. Do you have a question? No. Okay. I'll reserve for rebuttal. Thank you. Well, yeah, maybe. Okay. Good morning, Your Honor. My name is Jonathan Sabin. I'm a peer in Vivi Pelli, Fancy Enterprises, Inc. As Your Honor noted, there clearly were actions, volitional actions, by TVP in Poland. There were at least four of them. One, they selected the material, and it was a limited selection. Some of which, some of the material they selected, they owned the copyrights to worldwide. Some of the material they selected, they did not. They intentionally selected all of this to upload to their server. Two, with respect to material that they did not own the copyright or in the United States, they intentionally created formats that were un-geoblocked, the only purpose of which was so that those files could be viewed in the United States. Well, but their argument is that their violation occurred in Poland, and their statute doesn't have any extraterritorial application. That's correct. That's their argument, Your Honor. The violation, as Your Honor noticed, the infringement was in the United States. The public performance was in the United States. Their transmission, their fourth volitional act, commenced in Poland but ended in the United States. Transmission is not static. This is just the same as a TV broadcaster sitting in Tijuana broadcasting a signal. Yes, the signal initiates in Tijuana, but it's received in the United States. The counsel for TVP was incorrect that there are no cases. Yes, the government said this was a case of first impression in the circuit courts. There are numerous district courts that have dealt with this. TVP is attempting to stand Suba Films on its head. As Your Honor knows, what Suba Films held was that the only infringing act was abroad. U.S. copyright law doesn't count because the only act in Suba Films was the authorization in the United States, and authorization is not in itself a violation of any of the rights under Section 106 of the Copyright Act. It was the sale of the videos abroad. All infringement was abroad. The opposite, however, and this is the opposite, is where there's an action abroad, yes, but the infringement occurs in the United States. In this case, the public performance was in the United States, caused in large part by the actions abroad. There are at least three different district court cases that have dealt with this type of circumstance. They're cited in our briefs, but L.A. News, where a Canadian broadcaster broadcast filmed video of the rioting in L.A. after the Rotten King acquittal, and the broadcast bled over into the United States. The district court had no problem saying, yes, the action was in Canada. The broadcast emanated from Canada. It was received in the United States, I think in that case by 7,000 homes, and this constituted infringement in the United States. What do you think about Mr. Deutsch's distinction of aerial? I think it's a much too narrow reading of aerial, Your Honor. Yes. How do you read the case? Do you think the case applies here? Yes. Setting aside the extraterritorial aspect of it. Yes, Your Honor, at least in two ways. Tell us why. First, I think that the Supreme Court did deal with the issue of what is a public performance when there's a transmission. And I think that there is no question that this fits squarely within the facts of aerial. You can't fall within the facts of aerial. You need the interpretation of the statute. That's correct, Your Honor. Obviously the facts are somewhat different, but they're materially, for purposes of analysis, the same. That what you had is an organization transmitting copyrighted material and the transmission causing the public performance. That's what happened in aerial. That's exactly what happened here. And what about the language that the performance also occurred in Poland? Your Honor, that is sort of needles dancing on the head or angels dancing on the head of a can. That's what we do. I know, Your Honor, but whether there's a performance in Poland, one would depend on Polish law, which I don't pretend to be an expert on, to the only time there's a performance is, at least in my view, is if there's a transmission. If it just resides on the surface. Well, the transmission originates in Poland. Yes, it originates in Poland. So I thought you would have said the violation occurs when it's received and performed. That is correct, Your Honor. There has to be a transmission. The only way. So it's your point that, yes, there is a performance in Poland, but that's not what they're being held liable for? Certainly that is true, but the transmission itself is never, if it's transmitted to the United States, never just in Poland. Because let's assume for a moment that no one had sought to view the film at all. I think this was Your Honor's example, and it just resided on the surface. From their website. It just resided on the website. I think I would have to agree there's no public performance because there's no transmission to the public. It's not received by the public. It's not viewed by the public. If it just was uploaded and never viewed. Now we get to the situation where someone has requested that content. Now there's a transmission. The minute there's a transmission, and if it's into the United States, there's a viewing in the United States, so there is a public performance in the United States. Whether that transmission itself is a public performance in Poland, frankly, I'm not sure the answer under Polish law. But under U.S. law, certainly that transmission into the United States that causes the display to the public is a public performance. Your friend on the other side cites language from page 63 of the House report as supporting his view of performance occurring at transmission. The court in Aereo quoted that language at length and cited it. So what's your view of what that language says or doesn't say? I absolutely agree, Your Honor, that the performance occurred at the transmission into the United States. Again, looking at this just under U.S. copyright law. What I believe the House was saying and what Aereo was saying is the mere act of transmission can be a public, is itself a public performance. But keep in mind, Your Honor, if I may, that transmission was into the United States. Let's assume for a moment a hypothetical where that transmission was to someone in Poland. There would have been a transmission, but that certainly wouldn't have been a public performance under U.S. law. The minute that transmission is into the United States, as Your Honor said, there's no difference between what they were doing and what they would have been doing if they'd sat and resided in the United States. The technology was the same. The intent was the same. What they did was removal of geoblocking, the intentional transmission of copyright program to which they did not own the copyright in the territory. There's no difference. Let's assume for a moment that there is no geoblocking technology or this case arose before there was geoblocking technology. What then? Your Honor, I think there would be liability under the Copyright Act just in the same way that there has been liability for broadcasting to the United States in the L.A. News case. Well, if there hadn't been blocking technology, why would anybody in Canada have entered into an exclusive broadcast contract? I mean, it would have been impossible to make that happen, right?  If there isn't geoblocking, why would a Canadian company pay for the exclusive rights to broadcast in the United States? Now I understand your argument, Your Honor. Certainly it would lessen any economic incentive. Yeah, like down to zero. I'm sorry, Your Honor? Like down to zero. Very possible. Why would you pay for that? Well, you probably would not. It would certainly lessen the value of territorial rights in the United States. And I guess that is one of the economic consequences of someone doing something like this. In theory, what you could do is, one of the things TVP could have chosen to do without geoblocking is simply not put on its server content to which it didn't have worldwide rights. I mean, that is certainly an easy way to avoid liability. If you're putting something up for viewing to the world, it should only be something that you have rights throughout the world. Or, alternatively, you can geoblock it. But it is certainly a volitional act and intentional. If you put up rights, content available to the world where you don't have rights, then intentionally it was a geoblocking. I have a question that goes to the statutory damages issue. Can you help me understand how the log of 51 episodes was created? Was the log for each of the episodes created after the SCI lawyers had viewed the episode, or was it after they saw it on the TV Guide that it was going to be streamed? The log you're talking about was created, I believe, by Mr. Barnett. That is the exhibit that you're talking about. I believe that it was a combination thereof, Your Honor. What happened was, in anticipation of the episodes being shown, an initial log was created, but then it was checked with respect to each of the episodes when they were in fact broadcast. For all 51? Yes, I believe that is the testimony. Certainly the testimony of Mr. Gladkowski was that he had viewed all 51 episodes. And I believe Mr. Barnett's testimony was also. We cited that in our brief. As a matter of fact, Mr. Barnett said, I streamed each of them to make sure they were available. This was with respect to the 51. And that was in his testimony at A480-81. Mr. Barnett's testimony. That's correct, Your Honor. And another site for that is A1132-33 in the record sites. Certainly with respect to the 15 episodes, there is more than sufficient evidence in the record that, on any standard review of the district court, there's no clear error here. And as long as we're on statutory damages, Your Honor, Mr. Deutsch said in his brief that it's a de novo review of the willfulness finding, the recklessness finding. Just to respond to that, I believe that's clearly incorrect. Under the Supreme Court rule, willfulness is now a question for the jury. It's a question of fact for statutory damages. The only reason this was heard by the bench was because of the Foreign Sovereign Immunities Act, where there was no jury so that the judge was sitting as the finder of fact. And any willfulness determination would have to be reviewed as a finding of fact. Doesn't that create a problem for the extraterritorial issue? In other words, your position is that this was not extraterritorial because the performance was in the United States, right? That's correct. Yet the defendant here had no right to a jury because it's a foreign country? No, Your Honor. It had every right to a jury. It elected not to. Under the FSIA, the foreign sovereign can elect not to have a jury. I see. So he chose not to have a jury? He chose not to have a jury, Your Honor. So there is no contradiction. I believe I'm out of time, and I want to make sure the government is afforded an opportunity. Okay. So are there any questions? Okay, no. I don't think so. Thank you, Your Honors. So we'll hear from the government. Okay? May it please the Court, Megan Barbero on behalf of Amicus, the United States.  from servers located abroad is not infringement of the public performance right. A company could just move its servers over the border and stream to millions of American viewers, and that's just what every criminal enterprise would do. The United States' concern in this case is that TVP's argument, if accepted by this Court, would be a roadmap for criminal pirates to locate their servers abroad and reach— Okay, we got that, but give us your statutory argument. Explain to us. I mean, obviously, I get your policy argument, but how do you ground that in the statute? I think it would be helpful to look— And the case law. At the statutory—well, both the case law and the statutory definition support our argument that this is a domestic application of the public performance right with respect to the statutory definition. Do you have a case? Other than district court decisions, there's nothing, right? Well, the Supreme Court's decision in Aereo, which doesn't deal with the extraterritoriality analysis, but with respect to Internet streams of copyrighted material, makes clear that both the broadcaster and the viewer are performing. That is, the broadcaster performs when it transmits copyrighted material, and that performance occurs when the audience enjoys the work. That is, when the images are shown and the audio is heard. Now, that occurs when material is streamed over the Internet where the audience is located. Here, that was in the United States. And we know that from both the Supreme Court's decision in Aereo and the statutory definition of perform— So Aereo performed and its customers performed. That's correct. Aereo's argument was that, you know, it's only our subscribers who are performing. We're not performing. We're just streaming material over the Internet. And the Supreme Court rejected that. And the parties, I didn't understand them to be disputing, at least before the argument today, that if TVP servers were located in the United States and engaged in exactly the same conduct, that when it transmitted material, that is, in response to a user's request, the user says, you know, I'd like to see a particular show, TVP's servers transmit over the Internet that copyrighted work so that the user can enjoy it. And when we're looking at turning to the extraterritoriality analysis, if we look to the RJR Nabisco and the Morrison test, the question is really what was Congress's intent? What was the conduct that Congress was trying to regulate? What were the rights that it was trying to protect? And with respect to the public performance provision, that is the copyright holder's right to control the audience, to perform publicly. So it's not if I perform a song in the privacy of my own home to my children, a performance, yes, but not a public performance. If I do the same thing to a stadium full of people, it is a public performance in violation or infringement of the copyright holder's right. The reason is that the audience changed. And Congress was concerned about protecting copyright holders' access to the American market, the right to control where their works were shown in the United States. Here the district court found that the copyrighted material was shown to the public in the United States. That's a domestic infringement, a domestic application of the act, even if there was additional conduct that occurred abroad, and we know that from Morrison and RJR Nabisco. It is not the case that every single act has to occur in the United States. The question is the focus of the statute, and this provision is clearly focused on the public. And, of course, TVP here is a sophisticated actor. It made a business decision to give its exclusive rights to SEI and then lifted its geoblocking technology, as the district court found, to allow the streaming of the copyrighted programs into the United States. When it did so, it performed those works publicly to an American audience in the United States. And a contrary holding that TVP did not infringe, of course, as mentioned, would be not only a road map for criminal enterprises and large-scale pirates to locate servers abroad and reach an American audience. Mr. George said the government has lots of weapons to go after pirates. They're behaving unlawfully, violating criminal laws, right? Well, of course, other countries' laws are no substitute for U.S. law and our ability to prosecute criminal enterprises in the United States when they violate the rights of U.S. copyright holders. So you argued in your brief, you spent some time arguing that the statute is a strict liability statute. Correct. But given the district court's findings, do we even have to consider that question? No, because to the extent, I mean, well, with respect to it being a strict liability, the reason we argued that is to clarify that there's no intentionality. But given the district court findings, we don't even have to get there, do we? Not with respect to the volitional conduct aspect, no. And by the way, speaking of that, if that's true, what happens to something like YouTube if it's strict liability? Is YouTube liable for...? YouTube, if Your Honor is asking whether YouTube itself is liable, there's a safe harbor for Internet service providers under Section 512 of the statute. Except for that, it would be liable, right? There may well be liability there, which reinforces that streaming over the Internet, Congress anticipated that companies that facilitate streaming over the Internet of copyrighted works would be liable under Section 106, which was one reason to add the provision for Internet service providers. Any other questions? Okay, thank you. Did Mr. Deutsch have any time left? Okay, you can take two minutes if you would like. I appreciate the government's concession that there are multiple performances involving here, but what is not correct is their attempt to leap over that significant problem with this case and go to the question of whether it was public. Whether it was what? Public. There are two separate questions here in our position, which we think is strongly supported by Ariel, is that the performance by TVP took place in Poland. If you look at pages 2506 and 07 of Ariel, the Court says that it cites this House representative language that I cited to you. It says, The clause thus makes clear that an entity that acts like a CATV system itself performs, even when doing so, it simply enhances. I know, but what about the government's argument about Morrison and RJR? We know what Congress's focus is. Excuse me, I asked you about the government's argument that even if you're right, that performance occurred there under Morrison and RJR, we still have to focus on the domestic performance. It doesn't make any difference that there might have been action outside the country. In Morrison and RJR, there was no indication as to what Congress was thinking about in purpose of specific conduct. In Ariel, the Supreme Court said at great length what Congress did when it amended these two provisions. It was trying to bring cable television networks in within the copyrights. If we don't agree, if we don't interpret Ariel quite so narrowly, what's your argument then? Our argument is still that the statute and the legislative history says that my client performed in Poland and that if my client transmitted, it also transmitted in Poland, and those acts are extraterritorial and under more than 100 years of doctrine, they're not within the U.S. copyright law. Appreciate it. Thank you.
judges: Tatel, Griffith, Wilkins